Eastern District of Kentucky
FILED
NOV 27 2006
AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON

CIVIL ACTION NO. 06-82-GWU

JESSIE J. LOWE,                                                                  PLAINTIFF,

VS.               **MEMORANDUM OPINION**

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,           DEFENDANT.

## INTRODUCTION

The plaintiff brought this action to obtain judicial review of an administrative denial of his applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The appeal is currently before the Court on cross-motions for summary judgment.

## APPLICABLE LAW

Review of the Commissioner's decision is limited in scope to determining whether the findings of fact made are supported by substantial evidence. Jones v. Secretary of Health and Human Services, 945 F.2d 1365, 1368-1369 (6th Cir. 1991); Crouch v. Secretary of Health and Human Services, 909 F.2d 852, 855 (6th Cir. 1990). This "substantial evidence" is "such evidence as a reasonable mind shall accept as adequate to support a conclusion;" it is based on the record as a whole and must take into account whatever in the record fairly detracts from its weight. Crouch, 909 F.2d at 855.

1

Lowe

The regulations outline a five-step analysis for evaluating disability claims. See 20 C.F.R. Section 404.1520.

The step referring to the existence of a "severe" impairment has been held to be a de minimis hurdle in the disability determination process. Murphy v. Secretary of Health and Human Services, 801 F.2d 182, 185 (6th Cir. 1986). An impairment can be considered not severe only if it is a "slight abnormality that minimally affects work ability regardless of age, education, and experience." Farris v. Secretary of Health and Human Services, 773 F.2d 85, 90 (6th Cir. 1985). Essentially, the severity requirements may be used to weed out claims that are "totally groundless." Id., n.1.

Step four refers to the ability to return to one's past relevant category of work, the plaintiff is said to make out a prima facie case by proving that he or she is unable to return to work. Cf. Lashley v. Secretary of Health and Human Services, 708 F.2d 1048, 1053 (6th Cir. 1983). Once the case is made, however, if the Commissioner has failed to properly prove that there is work in the national economy which the plaintiff can perform, then an award of benefits may, under certain circumstances, be had. E.g., Faucher v. Secretary of Health and Human Services, 17 F.3d 171 (6th Cir. 1994). One of the ways for the Commissioner to perform this task is through the use of the medical vocational guidelines which

appear at 20 C.F.R. Part 404, Subpart P, Appendix 2 and analyze factors such as residual functional capacity, age, education and work experience.

One of the residual functional capacity levels used in the guidelines, called "light" level work, involves lifting no more than twenty pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds; a job is listed in this category if it encompasses a great deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls; by definition, a person capable of this level of activity must have the ability to do substantially all these activities. 20 C.F.R. 404.1567(b). "Sedentary work" is defined as having the capacity to lift no more than ten pounds at a time and occasionally lift or carry small articles and an occasional amount of walking and standing. 20 CFR 404.1567(a), 416.967(a).

However, when a claimant suffers from an impairment "that significantly diminishes his capacity to work, but does not manifest itself as a limitation on strength, for example, where a claimant suffers from a mental illness . . . manipulative restrictions . . . or heightened sensitivity to environmental contaminants . . . rote application of the grid [guidelines] is inappropriate . . ." Abbott v. Sullivan, 905 F.2d 918, 926 (6th Cir. 1990). If this non-exertional impairment is significant, the Commissioner may still use the rules as a framework for decision-making, 20 C.F.R. Part 404, Subpart P, Appendix 2, Rule 200.00(e); however,

3

Lowe

merely using the term "framework" in the text of the decision is insufficient, if a fair reading of the record reveals that the agency relied entirely on the grid. Ibid. In such cases, the agency may be required to consult a vocational specialist. Damron v. Secretary, 778 F.2d 279, 282 (6th Cir. 1985). Even then, substantial evidence to support the Commissioner's decision may be produced through reliance on this expert testimony only if the hypothetical question given to the expert accurately portrays the plaintiff's physical and mental impairments. Varley v. Secretary of Health and Human Services, 820 F.2d 777 (6th Cir. 1987).

## DISCUSSION

The administrative law judge (ALJ) found that Lowe suffered from unstable angina/syncope with a history of a decreased heart rate (with medications now helping to control the condition and no recent episodes), coronary artery disease (status post myocardial infarction with stent placement), and mild osteoarthritis/polyarthralgia pain. (Tr. 20). The conditions caused functional limitation to a restricted range of light level work. (Tr. 21). Although the plaintiff would be unable to perform his past work, according to the ALJ, Lowe was deemed capable of engaging in a significant number of light level jobs as per the testimony of a vocational expert (VE). (Tr. 22-23).

The VE had been asked to take into account the following factors: (1) a restriction to light level exertion, (2) a need for a sit-stand option with no prolonged

4

standing or walking in excess of one-half hour without interruption, (3) a need to completely avoid climbing of ropes or ladders and the ability to no more than occasionally climb stairs or ramps, (4) an ability to no more than frequently repetitively bend, twist, stoop, kneel or crouch, (5) a need to avoid hazards such as dangerous machinery or equipment, or unprotected heights, (6) a need to avoid concentrated exposure to extreme cold and (7) an inability to operate moving machinery or engage in commercial driving. (Tr. 283-284). In response, the VE named the light level job categories upon which the ALJ ultimately relied. (Tr. 23, 284-285).

The plaintiff argues that the aforesaid functional limitations did not fully take into account the restrictions cited by Suresh Rekhraj and Gery Tomassoni, both of whom were conceded by the defendant in her brief to have been treating physicians. In his opinion, the ALJ indicated that his findings were supported by the opinions of the non-examining medical reviewers (Tr. 21); he rejected Tomassoni's December 24, 2003 "total" statement as "a conclusory statement not supported by objective findings, cardiac assessment, or evaluation [and] . . . a finding of fact reserved to the Commissioner" (Tr. 19) and rejected Rekhraj's statement about the plaintiff's inability to carry on any physical activity since the cited ejection fraction differed from the fraction reported in Exhibits 8F and 11F (Tr. 19-20). Accordingly, a review of the medical evidence of record is in order.

5

Lowe

Shortly after the alleged onset date, the plaintiff was hospitalized with EKG results showing an acute anterior wall myocardial infarction. (Tr. 107). After catheterization, he underwent stenting of the left anterior descending artery. (Id.). His attending physician, Dr. Rekhraj, indicated that his condition at discharge on June 5, 2003 was stable, and that the patient had been advised to <u>gradually</u> resume his normal activities, and to do no driving or heavy lifting for the next 72 hours. (Tr. 107-108).

The record next contains an assessment from a non-examining medical reviewer. The form was completed in early November, 2003 (Tr. 123-131) and the reviewer cited restrictions consistent with the hypothetical question. However, it is not entirely clear exactly what evidence he reviewed, other than the hospital note-- his assessment was in Exhibit 3F, yet it makes reference apparently (Tr. 122, 134) to a portion of the records contained within Exhibit 8F (Tr. 188-190, 192, 193-195); Exhibit 8F, as compiled and entered into the record, could not have been finished until sometime after the last included record, dated April 20, <u>2004</u>, was written (Tr. 6). The records actively referred to at the time of the medical reviewer's assessment were the September and October, 2003 treatment records of Ashutosh Mishra of Mary Breckenridge Healthcare, and which indicate each of multiple x-rays were normal (Tr. 191-192), the sed rate was only slightly elevated (Tr. 188, 195),

6

joints showed no active sign of inflammation or redness (Tr. 188, 190) and chest wall pain was evidently not felt to be of cardiac origin (Tr. 190).

Exhibit 8F itself also shows that Mishra saw the plaintiff in early November, 2003. The plaintiff's complaints regarding polyarthritis continued and Mishra observed some mild tenderness of the lumbar spine and puffiness of the fingers (Tr. 187), but the doctor also specifically noted that an x-ray of the lumbar spine had been normal as had an arterial Doppler of the lower limbs; an EKG showed only drug-induced bradycardia and the doctor felt that the coronary artery disease was stable. (Id.).

Later in the month, the plaintiff evidently saw Roy Varghese at the same facility, complaining of moderate chest pain. (Tr. 140-146). Heart sounds were normal (Tr. 141), a chest x-ray showed no active cardiopulmonary disease (Tr. 144), and a cardiac panel was unremarkable (Tr. 146). An EKG was abnormal, however. (Tr. 145).

It was believed by at least one source that this last incident represented a second myocardial infarction and it was noted that the plaintiff underwent a left heart catheterization and a stent placement (Tr. 174, 176). Dr. Rekhraj referred the patient to Dr. Tomassoni for diagnostic electrophysiology for evaluation of a possible ICD. (Tr. 174).

7

Lowe

Testing by Dr. Tomassoni was done in mid-December, 2003. The study was reportedly conducted because of a depressed left ventricular ejection fraction and non-sustained ventricular tachycardia (Tr. 162). The results showed <u>no</u> inducible ventricular tachycardia or ventricular fibrillation and <u>no</u> inducible supraventricular tachycardia. Eight days later, under the "diagnosis" section on a form, Tomassoni opined that the plaintiff was "total from a cardiac point of view" (Tr. 173); it is not clear to this layman, however, exactly what the doctor meant by that statement.

The plaintiff underwent a consultative physical examination by Mark Burns in March, 2004. (Tr. 178). Cardiac sounds were normal and there was no clubbing, cyanosis or edema of the extremities. (Tr. 180). There was no redness, tenderness or deformities of the extremities, and the back was non-tender. (Id.). The patient was said to have normal grip strength, gait, station, and squatting ability. (Tr. 180-181). In summary, the orthopedic portion of the examination was normal, and the patient appeared to have stable angina. (Tr. 181). The examination as a whole was unremarkable, and this patient was said to have the ability to sit, stand, lift, carry, handle objects, and move about. (Id.).

In early April, an echocardiogram showed mild mitral regurgitation, mild tricuspid regurgitation and an ejection fraction of <u>55</u> percent (Tr. 196), which was a higher percentage than that shown in the earlier testing.

Later that month, Lowe again saw Ashutosh Mishra, indicating that he was overall "doing well" and had no chest pain, palpitations or shortness of breath. (Tr. 186). His cardiovascular disease was felt to be stable. (Id.).

Noting that the plaintiff's cardiovascular disease appeared stable, and crediting the plaintiff with polyarthritis, a medical reviewer opined that the plaintiff could engage in light level work with only a limitation of exposure to extreme cold. (Tr. 199-206). Apparently, the reviewer did not appear to have considered Dr. Tomassoni's "total" statement a clear expression of functional capacity, so as to reference it in the assessment form. (Tr. 205).

After the last of the two medical reviewer's assessments, Lowe returned to Dr. Rekhraj. In May, the plaintiff was complaining of shortness of breath and severe pain between his shoulder blades. (Tr. 231). Blood pressure was elevated at 130/90 and there was edema in the lower extremities (Tr. 232). The doctor ordered a stress test which showed apical wall ischemia and an ejection fraction of 57 percent. (Tr. 234). When seen in early June, the doctor noted signs of severe hypotension of 98/80 and the results of the echocardiogram; a positive stress test and LV dysfunction were among the items noted on the assessment section of the progress note. (Tr. 230). In August, the plaintiff returned to the physician complaining of chest pain and noted that he had missed his catheterization appointment that July because he was in the hospital for a bladder infection (Tr.

9

227); blood pressure was recorded at 105/71 (Tr. 228) and Dr. Rekhraj wrote that the catheterization[1] need to be rescheduled. After the catheterization, however, Rekhraj stated that the patient was "stable from a cardiac standpoint and appears to be doing well"; he was told to "exercise as much as he can tolerate." (Tr. 226). Much the same general assessment and recommendations were made in October, albeit the patient had had an episode of near-syncope several days beforehand (Tr. 223-224) and again in January, 2005, although there were complaints of occasional dizziness, chest pain and shortness of breath (Tr. 221-222).

One episode of chest pain in between those last visits had prompted another physician to hospitalize the patient. (Tr. 209). A myocardial infarction was ruled out. (Tr. 210). He was said to be at "low risk" and could be discharged home, with the expectation of a Holter Monitor to rule out bradyarrhythmias. (Id.).

In May, 2004, Dr. Rekhraj had completed a form essentially finding the plaintiff was disabled. (Tr. 208). However, some of his specific findings (e.g., peripheral edema and fraction of 35 percent) obviously were not compatible with his own clinic's findings after that mid-May period (Tr. 210, 214, 224, 225, 234) and were not necessarily compatible with information in the two months before that date (Tr. 178-181, 186, 196). The doctor's own last progress note in January, 2005

---

[1]The catheterization report, written by Rekhraj himself, noted 30 percent to 50 percent in stent restenosis and normal LV function with an ejection fraction of 50 percent and mild anterior hypokenesia. (Tr. 214).

10

Lowe

indicated, as stated previously, that he was "stable from a cardiac standpoint and appears to be doing well" and he was encouraged to "exercise as much as he can tolerate." (Tr. 222).

Accordingly, there were patent reasons to discount the two treating physician's statements/assessments, at least for the period beginning in March, 2004--less than 12 months since the alleged onset date and, hence, not qualifying for disability benefits. Around that same time, Consultative Examiner Mark Burns concluded that the plaintiff could perform multiple activities and had an essentially normal physical examination and the latest medical reviewer opined that Lowe was capable of light level work. Thus, the residual functional capacity assessment chosen by the ALJ was supported by substantial evidence.

For the reasons stated in the defendant's brief at pp. 7-9, the plaintiff's argument regarding LOI Section 4.04 is rejected.

The decision will be affirmed.

This the 27 day of November, 2006.

G. WIX UNTHANK
SENIOR JUDGE